UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| ROBERT WILSON on behalf of himself and as the representative of Mary Ellen Wilson (deceased), <br><br> Plaintiff, <br><br> v. <br><br> KELSEY CHEVROLET, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 4:24-cv-00077-TWP-KMB |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Kelsey Chevrolet, LLC ("Kelsey") (Filing No. 58). Plaintiff Robert Wilson ("Wilson"), on behalf of himself and as the representative of his late mother, Mary Ellen Wilson, (collectively "Plaintiffs") brought this action alleging that Kelsey, a car dealership, negligently and willfully violated Section 1681b(f) of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA"), by forwarding Wilson's joint automobile financing application to numerous potential lenders without Wilson's knowledge or consent. Wilson asserts that the resultant credit inquiries substantially lowered his and his mother's credit scores. Kelsey now seeks summary judgment as to the FCRA claims. For the following reasons, the Court **grants** Kelsey's Motion for Summary Judgment.

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Wilson as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This lawsuit, like so many others, arises from an unpleasant experience at a car dealership. Wilson wanted to buy a used truck from Kelsey (Filing No. 40 at 12:1–18). He applied online for joint financing with his mother, Mary Ellen Wilson, through Capital One, and the application was quickly pre-approved. *Id.* at 12:25–13:24. On January 12, 2023, Wilson and his wife (but not his mother) visited the Kelsey dealership and met with salesperson Ken Nieman ("Nieman"). *Id.* at 15:14–19, 30:1–4. After a test drive, Nieman presented Wilson with a joint financing application (the "Joint Application"), which Wilson signed on behalf of himself and his mother, as her power of attorney. *Id.* at 16:3–13, 17:12–18:17; (Filing No. 61-2 at 2). Wilson asked why a credit application was needed, since his online application had been pre-approved by Capital One. Nieman responded that Capital One needed a "hard pull" of Wilson's and Mary Ellen Wilson's credit reports to approve the loan (Filing No. 40 at 19:23–24:1). Wilson requested that the Joint Application be submitted to only Capital One[1]. *Id.* at 19:18–21. According to Wilson, Nieman gave assurances that the Joint Application would be submitted to only Capital One; but according to Nieman, Wilson was told that the Joint Application would be sent to multiple lenders, and Wilson did not object. *Id.* at 19:18 –21, 26:12–13, 45:1–7; (Filing No. 61-3 at 22:2–10).[2] In any event, it is undisputed that Kelsey submitted the Joint Application to multiple potential lenders (Filing No. 61-5; Filing No. 61-6).

Later that evening, Kelsey sales manager Skylar Yelton ("Yelton") informed Wilson that Capital One had denied the Joint Application (Filing No. 40 at 23:1–20). As a result, Wilson did not buy the truck that day and instead paid a deposit to keep the vehicle on hold. *Id.* at 24:23–25:7,

---

[1] The parties dispute whether Kelsey knew that Mr. Wilson did not want the Joint Application sent elsewhere, and whether Mr. Wilson knew that the Joint Application would be sent to other lenders.
[2] To the extent any deposition page numbers do not match the ECF page numbers, the Court refers to the deposition page numbers.

27:22–28:13. Yelton also told Wilson that Kelsey had sent the Joint Application to several other lenders to try to obtain financing. *Id.* at 23:1–22, 32:8–18.

The next day, January 13, 2023, Wilson learned via phone that he, individually, had been approved for financing through Foursight Capital. *Id.* at 37:15–22; (Filing No. 61-3 at 25:13–19). Wilson returned to the Kelsey dealership that day, and Nieman had Wilson sign a different credit authorization document, in his name only (Filing No. 40 at 28:2–10, 36:14–18, 39:8–14; Filing No. 61-3 at 27:5–7; Filing No. 61-8). Wilson ultimately purchased the truck (in his name only) on January 13, 2023, using the Foursight Capital loan (Filing No. 40 at 38:18–39:4).

Soon after his visits to Kelsey, Wilson began receiving notifications from Credit Karma, a credit monitoring website, about multiple loan denials from other institutions that had received the Joint Application. *Id.* at 32:6–12. The parties both believe that the Joint Application was denied because lenders generally do not approve joint financing applications signed using a power of attorney. *Id.* at 41:1–42:10; (Filing No. 61-3 at 26:5–9). Based on information Wilson later obtained from Credit Karma and loan denial letters, his and his mother's credit scores decreased substantially following the Joint Application denials (Filing No. 40 at 56:4–14; Filing No. 61-7). However, the parties dispute whether the distribution of the Joint Application and resultant credit inquiries caused the drop in credit scores.

Wilson, individually and as power of attorney for Mary Ellen Wilson, filed this FCRA action against Kelsey in June 2024 (Filing No. 1). Mary Ellen tragically passed away a few months later, and Wilson, as the representative of her estate, was later substituted as a plaintiff in this action (Filing No. 19; Filing No. 28). On May 13, 2025 Kelsey filed a Motion for Summary Judgment. That motion is now ripe for the Court's consideration.

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.  DISCUSSION

Plaintiffs bring two claims in their Complaint—Claim One: Negligent Violation of the FCRA in violation of 15 U.S.C. § 1681b(f), and without a permissible purpose in violation of 15 U.S.C. § 1681b, because Kelsey accessed Wilson and his mother's credit reports without authorization, which constitutes negligent and willful non-compliance with the FCRA, as stated in 15 U.S.C. § 1681o; and, Claim Two: Willful Violation of the FCRA under 15 U.S.C. §§ 1681n, respectively (Filing No. 1 at 3–4). Kelsey argues these claims must be dismissed (1) because Kelsey itself did not use or obtain the credit reports; (2) because Wilson consented to the credit inquiries by signing the Joint Application; and (3) because Wilson cannot show that the credit inquiries at issue caused the alleged drop in credit scores.[3] The Court will address only the first argument, because it is dispositive.

Section 1681b(f) of the FCRA provides:

> A person shall not use or obtain a consumer report for any purpose unless--
>
> > (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
> >
> > (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f). Accordingly, to succeed on his FCRA claims, Wilson must show that Kelsey "use[d] or obtain[ed] a consumer report" without a permissible purpose.

Kelsey argues that it did not "use or obtain a consumer report" and cannot be held liable for the credit pulls by third-party lenders, citing a similar case from the Northern District of Illinois,

---

[3] Kelsey also argues that it is not a "furnisher of information" under 15 U.S.C. § 1681s-2, but this argument is immaterial (Filing No. 58 at 9). Plaintiffs' Complaint does not allege that Kelsey violated § 1681s-2, and Plaintiffs' response brief does not address Kelsey's alleged status as a "furnisher of information." (Filing No. 61).

*Castro v. Union Nissan, Inc.*, No. 01 C 4996, 2002 WL 1466810 (N.D. Ill. July 8, 2002) (Filing No. 58 at 7).

In *Castro*, the plaintiffs had a very similar, if not worse, dealership experience. 2002 WL 1466810, at *1. Plaintiffs Nelson and Ivelisse Castro (the "Castros") visited the Union Nissan dealership to buy a Toyota. They were informed that financing was available through Great Lakes Credit Union, so they decided to purchase the vehicle. As part of the sale, the Castros agreed to trade in their Jeep, and Union Nissan agreed to pay off the lien on the Jeep. The Castros signed the loan and sale documents, traded in their Jeep, and left with the Toyota. Unfortunately, the Castros later learned that Great Lakes Credit Union had declined to finance the Toyota purchase. The Castros went back to the dealership to unwind the transaction, but Union Nissan refused, so the Castros again left the dealership with the Toyota. *Id.* Over the next few months, "the Castros received several denial of credit letters from various lenders," even though they "had never filled out credit applications for these institutions, nor had they authorized Union Nissan to 'shop around' their credit." *Id.* Union Nissan never obtained financing for the Castros, so it repossessed the Toyota, failed to return their Jeep, and failed to pay off the Jeep lien, leaving the Castros without a vehicle, in debt on the Jeep, and with several unauthorized inquiries on their credit records. The Castros brought several claims against Union Nissan, including an alleged violation of § 1681b(f) "by repeatedly attempting to procure credit for the Toyota after the Castros asserted that they no longer wished to complete the transaction." *Id.* at *2.

The Castros moved for summary judgment on their claims, but the district court denied their motion. The *Castro* court stated that although dealerships may be liable under § 1681d(f) in certain circumstances, Union Nissan would not be liable if only the third-party lenders, and not Union Nissan, requested the Castros' credit information. The court explained:

6

> There appears to be no dispute, at least with respect to the credit pulls [at issue], that it was the third-party lenders that accessed the Castros' credit reports—not Union Nissan. At most, Union Nissan took action that ultimately resulted in the pulling of a credit report. In the absence of any authority that would extend § 1681b(f) to this situation or any argument by the Castros as to how they propose to avoid the language of the statute, we decline to interpret the statute so as to hold Union Nissan liable for the actions of the third party lenders.

*Id.* at *3. The *Castro* court further clarified that "[i]f *Union Nissan* requested Nelson Castro's credit report . . . that request *could* constitute a violation of § 1681b(f)," but the plaintiffs were not entitled to summary judgment because, at that stage, it was "unclear whether Union Nissan [was] the entity that obtained Nelson's credit report." *Id.* (emphases added).

Wilson responds that *Castro* is unpersuasive and contradicts a 1998 advisory opinion from the Federal Trade Commission. *Advisory Opinion to Throne*, Fed. Trade Comm'n (Nov. 20, 1998), https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-throne-11-20-98 ("*Throne*"); (Filing No. 61-9). Wilson argues that Kelsey should be held liable for its unauthorized and widespread dissemination of his and his mother's credit information (Filing No. 61 at 10–11). After reviewing both parties' cited authority and additional research, the Court agrees with Kelsey that it is not liable for violating § 1681b(f) in this case.

The Court is not persuaded by Wilson's argument. Although not binding, the *Castro* court's reasoning is consistent with the language and definitions of § 1681b(f), and the Court finds it persuasive. Section 1681b(f) does not prohibit the unauthorized use of any and all information pertaining to credit. It prohibits only the use or obtainment of a "consumer report." The FCRA defines "consumer report" as "any . . . communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness . . . which is used or expected to be used or collected . . . for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit." 15 U.S.C. § 1681a(d)(1). A "consumer reporting agency," in turn, is turn defined as "any person which . . . regularly engages in whole or in part in the practice of assembling or evaluating

7

consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." *Id.* § 1681a(f). In layman's terms, a "consumer report" under the FCRA is a credit report issued by a credit reporting agency (*e.g.*, Equifax, TransUnion, Experian).

Kelsey did not use or obtain a "consumer report." Wilson insists that Kelsey improperly distributed his and his mother's "credit information," but the undisputed material facts show that Kelsey only distributed the Joint Application, which is not a "consumer report" because it does not contain or communicate information from a "consumer reporting agency bearing on [Wilson's or Mary Ellen Wilson's] credit worthiness." 15 U.S.C. § 1681a(d)(1). The Joint Application is nothing more than a one-page form giving Wilson's consent to obtain a consumer report ([Filing No. 61-2 at 2](#) (authorizing the recipient to "obtain . . . a credit report from one or more consumer reporting agencies (credit bureaus) in connection with this application")).

Kelsey, like the dealership in *Castro*, did not "use or obtain a consumer report" by sending the Joint Application to multiple lenders, and there are no allegations that Kelsey itself used or obtained a consumer report from the lenders or a credit reporting agency. Accordingly, based on the undisputed material facts, Kelsey did not violate § 1681b(f) and is therefore not liable for negligent or willful non-compliance with the FCRA.

Wilson and his mother are not the first, nor the last, consumers to have a dealership "shop" their credit application without their permission. "This is a common scenario. Dealers routinely attempt to assign tentative financing arrangements to lenders, and those lenders often rely on a consumer's credit report to determine whether the deal is worth taking." *Stergiopoulos v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1044 (7th Cir. 2005). However, in these types of cases, the defendants are often the lenders that actually requested the consumer reports. *See id.* (discussing

8

class action FCRA claim against *lenders* that requested plaintiffs' credit reports upon being forwarded credit applications from dealerships); *Kowalski v. Francois Sales & Servs., Inc.*, No. 18-cv-721, 2019 WL 2189484 at *3 (W.D. Wis. May 21, 2019) (dismissing, under Rule 12(c), § 1681b(f) claims against *lender* that requested plaintiff's credit reports upon receiving credit applications from dealership without plaintiff's consent); *Young v. Harbor Motor Works, Inc.*, No. 07-CV-31, 2009 WL 187793, at *3, 5 (N.D. Ind. Jan. 27, 2009) (dismissing FCRA claims against *bank* that requested and obtained copy of plaintiff's credit report, after plaintiff had informed dealership orally and in writing that he wanted his credit pulled only by another lender).

In other cases, dealerships have been properly sued under the FCRA when they themselves used or obtained a consumer report, or they have been sued under other legal theories for their unauthorized distribution of loan applications. *See Long v. Bergstrom Victory Lane, Inc.*, No. 18-C-688, 2018 WL 4829192, at *1–3 (E.D. Wis. Oct. 4, 2018) (granting motion to dismiss § 1681b claims against dealership that submitted plaintiff's "credit application *and report* to a number of companies" (emphasis added)); *Murray v. Sunrise Chevrolet, Inc.*, No. 04 C 7668, 2005 WL 2284245, at *4 (N.D. Ill. Sept. 15, 2005) (denying motion to dismiss FCRA claim alleging that defendant dealership allegedly accessed plaintiff's credit report); *Adams v. Berger Chevrolet, Inc.*, No. 00CV225, 2001 WL 533811, at *4 (W.D. Mich. May 7, 2001) (finding dealership liable for violating § 1681b(f) where a dealership employee used customers' credit reports to try to obtain financing for another customer, forged credit applications, and had manager request credit reports from TransUnion); *see also, e.g., Castro*, 2002 WL 1466810, at *1 (suing dealership under the Truth in Lending Act, Equal Credit Opportunity Act, and Illinois Consumer Fraud Act, aside from FCRA); *Kowalski*, 2019 WL 2189484, at *3 (suing dealership for invasion of privacy under state law, aside from FCRA); *Long*, 2018 WL 4829192, at *1 (suing dealership under Fair Debt

9

Collection Practices Act and Wisconsin Consumer Act, aside from FCRA); *Young*, 2009 WL 187793, at *7 (discussing claims against dealership under Indiana Deceptive Consumer Sales Act).

Based on the plain language and definitions of § 1681b(f), Kelsey did not "use or obtain a consumer report" by forwarding the Joint Application to potential lenders. The *Throne* Advisory Opinion cited by Wilson does not convince the Court otherwise. *Throne* does not address the liability of dealerships under the FCRA, claims under § 1681b(f), or any other legal issue material to this action. Rather, in *Throne*, the Federal Trade Commission considered whether the "joint user exception to the definition of consumer reporting agency," as announced in agency staff commentary to the FCRA, "requires the disclosure to the consumer of the identity of . . . additional lenders to whom a loan application may be forwarded." Specifically, in *Throne*, a bank inquired whether it could forward consumer loan applications, which the bank could not approve, to other undisclosed lenders without becoming a "credit reporting agency" under the FCRA. The Federal Trade Commission answered in the affirmative, based on the "joint user exception" to the definition of a consumer reporting agency. The Federal Trade Commission continued, however, that although the bank undoubtedly had a "permissible purpose in obtaining a consumer report in connection with a consumer's application for credit under [§ 1681b(a)(3)(A)]," the lenders to whom the application was forwarded would also need to have the consumer's consent. In short, *Throne* addressed whether a lender becomes a "consumer reporting agency" by forwarding loan applications to other lenders, and whether the lenders who receive the forwarded application share the bank's "permissible purpose" for obtaining a consumer report or must have their own permissible purpose. *Throne* does not, as Wilson suggests, announce that a dealership or other entity "use[s] or obtain[s] a consumer report" merely by forwarding an application to lenders who consequently request the consumer report.

Based on the undisputed material facts, Kelsey did not "use or obtain a consumer report" without a permissible purpose in violation of § 1681b(f). Kelsey has shown that Wilson cannot succeed on his claims of negligent or willful non-compliance with the FCRA and it is entitled to judgment as a matter of law.

## IV.     CONCLUSION

For the reasons discussed above, the Court **GRANTS** Kelsey's Motion for Summary Judgment ([Filing No. 58](#)). Wilson's claims are **DISMISSED** on summary judgment. Final judgment will issue under separate order.

**SO ORDERED**.

Date:   11/4/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Stephen M Bernat
McCaslin Imbus & McCaslin
smbernat@mimlaw.com

David W. Hemminger
HEMMINGER LAW OFFICE
hemmingerlawoffice@gmail.com